UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                        :
AMANDA JOHNSON,                                         :
                                                        :
                            Plaintiff,                  :              18 Civ. 9786 (JPC)
                                                        :
            -v-                                         :              OPINION AND ORDER
                                                        :
L'ORÉAL USA,                                            :
                                                        :
                            Defendant.                  :
                                                        :
-------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

Plaintiff Amanda Johnson sued her former employer L'Oréal USA ("L'Oréal"), alleging

that L'Oréal discriminated against her on the basis of race, disability, and association with a person

with a disability, and retaliated against her for speaking out against discrimination.  Now before

the Court is L'Oréal's motion for summary judgment on all claims.  For reasons that follow,

L'Oréal's motion is granted in part.  The Court dismisses all of Johnson's claims with prejudice,

except for her claims under the New York City Human Rights Law ("NYCHRL"), over which the

Court declines to exercise supplemental jurisdiction and therefore dismisses without prejudice.

## I.  Background

### A.  Facts[1]

Johnson is an African American woman with more than a decade of experience in digital

---

[1]  The following facts are drawn primarily from the parties' statements of material facts
pursuant to Local Civil Rule 56.1, Dkt. 98 ("Def. 56.1 Stmt."); Dkt. 117 ¶¶ 1-317 ("Pl. Counter
56.1 Stmt."); *id*. ¶¶ 318-734 ("Pl. 56.1 Stmt."); Dkt. 126 ("Def. Reply 56.1 Stmt."), and the
declarations submitted in support of and in opposition to L'Oréal's motion for summary judgment,
as well as the exhibits attached thereto.  The Court notes that Johnson's purported statement of
material facts goes well beyond the confines of Local Civil Rule 56.1, which allows the party
opposing a motion for summary judgment to include, "if necessary, additional paragraphs

marketing, business development, and broadcast journalism.  Pl. 56.1 Stmt. ¶¶ 318-320.  Johnson

began her career at L'Oréal in March 2016.  Def. 56.1 Stmt. ¶ 18.  L'Oréal is a wholly owned

subsidiary of a French company, L'Oréal S.A.  Dkt. 114, Exh. 121.

Johnson was hired as the Assistant Vice President, Digital Marketing, for L'Oréal Matrix

Direction Marketing International ("DMI"), a sector of L'Oréal's Professional Products Division

responsible for creating the global strategies of two L'Oréal brands, Matrix and Biolage.  Def. 56.1

Stmt. ¶¶ 8, 18.  In her role as Assistant Vice President, Johnson reported to Daniel Bethelmy-Rada,

who from January 2015 through July 2019 was the Matrix and Biolage Global Brand President.

*Id.* ¶¶ 4, 18.

Bethelmy-Rada, who grew up in Venezuela and identifies as "racially Black, Caucasian,

and Latin American Indian," as well as French and Venezuelan, interviewed Johnson and was

involved in the decision to hire her.  *Id.* ¶¶ 5, 19; Dkt. 101 ("Bethelmy-Rada Declaration") ¶ 2;

Dkt. 112, Exh. 3 ("Bethelmy-Rada Deposition Tr.") at 19:22-20:4, 21:11.  Some L'Oréal

employees have characterized Bethelmy-Rada as "confrontational," "emotional," and

"[p]assionate," based on his "French way of doing things."  Dkt. 112, Exh. 2 ("Morales Deposition

Tr.") at 205:5-7; Dkt. 112, Exh. 6 ("Griggs Deposition Tr.") at 95:18-96:15; *see also* Morales

Deposition Tr. at 204:20-205:4 (describing Bethelmy-Rada's debating style as "a very . . . typical

L'Oréal way of trying to strive for . . . perfection," "always asking questions and never taking no

---

containing a separate, short and concise statement of *additional* material facts as to which it is
contended that there exists a genuine issue to be tried."  Local Civ. Rule 56.1(b) (emphasis added).
Johnson's 416-paragraph Rule 56.1 Statement instead recites and restates all facts from her point
of view.

 Unless otherwise noted, the Court cites to only one party's Rule 56.1 Statement where the
parties do not dispute the fact, the adverse party has offered no admissible evidence to refute that
fact, or the adverse party simply seeks to add its own "spin" on the fact or otherwise dispute the
inferences from the stated fact.

for an answer," and noting that "it's a . . . different cultural style[] or approach than I think we are used to here in . . . the U.S.").

It is undisputed that Bethelmy-Rada strongly supported Johnson's career when she began at L'Oréal and that Johnson initially excelled.  Def. 56.1 Stmt. ¶ 33.  When she was first hired, Johnson was responsible for relaunching Matrix's website, building a digital team for social media and community management, and providing digital support for the Biolage product.  *Id.* ¶¶ 20-21.  In 2016, Bethelmy-Rada gave Johnson a positive performance review.  *Id.* ¶ 34.  In early 2017, Bethelmy-Rada agreed with Johnson's placement on L'Oréal's talent list, which identifies high-performing employees.  *Id.* ¶¶ 35-36.  Bethelmy-Rada assigned the largest budget to Johnson; Johnson was responsible for managing a budget of $2,655,000, while the next largest budget was $2,321,000. *Id.* ¶¶ 37-38.  And her budget increased by $703,000 in 2017, while the whole team's budget was cut by over $413,000.  *Id.* ¶ 39.  At Bethelmy-Rada's recommendation, L'Oréal promoted Johnson in July 2017.  *Id.* ¶¶ 41-42.  Bethelmy-Rada called Johnson his "right hand in the transformation of the DMI." *Id.* ¶ 43; Bethelmy-Rada Declaration ¶ 15.  In addition, Bethelmy-Rada introduced Johnson to high-level executives at L'Oréal, including the President of the Professional Products Division.  Def. 56.1 Stmt. ¶¶ 45-46.  Bethelmy-Rada did, however, warn Johnson about certain concerns he had with her tone and communication style.  *Id.* ¶ 44.

In late summer or fall of 2017, L'Oréal implemented certain structural changes that negatively impacted the work of Johnson's team.  Specifically, L'Oréal put in place a new marketing structure for the Professional Products Division.  *Id.* ¶¶ 25-26.  L'Oréal started by splitting Biolage off from Matrix and selecting Nour Tayara, the then-Assistant Vice President of Haircare, to lead Biolage.  *Id.* ¶¶ 9, 26-27.  One of Johnson's reports, Dick Younge, the Global Digital Manager for Biolage DMI, began reporting to Tayara, *id.* ¶¶ 23, 28, which Johnson felt

disrupted her team's work, Pl. Counter 56.1 Stmt. ¶ 30.

Around this time, L'Oréal provided Tayara with an executive coach.  *Id.* ¶ 284.  L'Oréal has an Executive Coaching program that is designed to support L'Oréal executives at the Vice President level or higher during a transition or to "accelerate performance/development."  Dkt. 106 ("Morales Declaration"), Exh. R.  L'Oréal contends that Executive Coaching is not meant to be "remedial."  *Id.* ¶¶ 93-94, Exh. R.  Tayara testified that he received an executive coach to help with the transition to his new role and because of difficulties he had with Bethelmy-Rada.  Dkt. 112, Exh. 8 at 61:14-24.

Starting around this time, Johnson had several incidents at work that caused her colleagues concern.  For instance, Bethelmy-Rada observed that Johnson had friction with the Matrix U.S. team and global zone leaders, and found that she took an inappropriate, aggressive tone during meetings with those individuals.  Def. 56.1 Stmt. ¶¶ 48-50; Bethelmy-Rada Declaration ¶ 18. Bethelmy-Rada testified that he gave Johnson constructive feedback about these meetings, but Johnson contends he only cautioned her about her tone during her year-end review.  *Compare* Bethelmy-Rada Declaration ¶ 18 *with* Dkt. 111 ("Johnson Declaration") ¶¶ 119-120.  Bethelmy-Rada also had concerns about a meeting that month between Bethelmy-Rada, Johnson, and Arnaud Jeanteur, Bethelmy-Rada's boss.  Def. 56.1 Stmt. ¶ 51.  During that meeting, Johnson complained about her issues with the Matrix U.S. team, instead of sharing her accomplishments, which frustrated Bethelmy-Rada.  *Id.* ¶¶ 53-54.

And several other L'Oréal employees complained about Johnson's behavior to Maria Morales,[2] the Assistant Vice President of Human Resources at L'Oréal, who was tasked with

---

[2] As discussed shortly, another L'Oréal employee with the surname Morales, Mallory Morales, is relevant to this case.  The Court refers to Maria Morales as "Morales" and Mallory Morales by her full name.

supporting the Professional Products Division, including the Matrix DMI team.  *Id.* ¶ 17.  For instance, Chizuru Wykoff, Vice President of Creative for Matrix DMI, complained to Morales that Johnson was loud and confrontational during an argument and that she believed Johnson was capable of being physically threatening.  *Id.* ¶¶ 55-57, 60.[3]  Morales states that she told Wykoff to discuss it with Bethelmy-Rada and that she (Morales) would discuss it with Johnson.  Morales Declaration ¶ 14.

Then, in February 2018, Johnson had a dispute with Bethelmy-Rada during a meeting to discuss Johnson's expenses.  Def. 56.1 Stmt. ¶ 61.  At this meeting were Johnson, Bethelmy-Rada, and Mallory Morales, the Director of Finance and Global Brand Controller for L'Oréal's Professional Products Division.  *Id.*  Johnson became upset during the meeting.  *Id.* ¶ 64.  The parties dispute the reason why Johnson was upset:  Bethelmy-Rada attests that Johnson was unprepared for the meeting and he told her that was unacceptable, *see id.* ¶¶ 62-63, 65; Bethelmy-Rada Declaration ¶ 21, whereas Johnson insists she was prepared but Bethelmy-Rada had given her inconsistent instructions prior to the meeting, Johnson Declaration ¶¶ 148-149.  While both parties agree that Johnson yelled at Bethelmy-Rada, Bethelmy-Rada contends Johnson also raised her hands at him.  *See* Def. 56.1 Stmt. ¶ 66; Bethelmy-Rada Declaration ¶ 21.  Johnson denies doing this.  Pl. Counter 56.1 Stmt. ¶ 66.

Johnson's text messages provide further color on the incident:  Johnson texted another employee that she "just got as angry as [she had] ever been with dan (and Mallory)," referring to

---

[3] Johnson objects to Morales's statements in her declaration regarding employee complaints as inadmissible hearsay.  These statements are admissible not for the truth of the matter asserted, but for establishing that Morales received these complaints.  *See, e.g.*, *Braunstein v. Sahara Plaza, LLC*, No. 16 Civ. 8879 (VSB), 2021 WL 2650369, at *10 & n.14 (S.D.N.Y. June 28, 2021) ("Although Mariano's testimony is not admissible to establish that Plaintiff actually engage in the conduct described by Mariano and Hunt, his mere statement that he received complaints about Plaintiff was not hearsay.").

Bethelmy-Rada and Mallory Morales.  Dkt. 105, Exh. L; *see* Pl. Counter 56.1 Stmt. ¶ 72.  Johnson

wrote that "it was NOT PRETTY," and she "was so triggered [she] got up and closed his door."

Dkt. 105, Exh. L.  She also texted that she "had some for that bitch Mallory too" and that Mallory

Morales was "shook."  Pl. Counter 56.1 Stmt. ¶¶ 61, 73.  Mallory Morales reported this incident

to Morales in Human Resources, saying that Johnson had yelled and was disrespectful.  Def. 56.1

Stmt. ¶¶ 70-71.

In addition, four of Johnson's subordinates complained to Bethelmy-Rada that Johnson

was absent from work, did not answer emails, had friction with her team, and left them feeling

abandoned.  *Id*. ¶ 74.  Johnson admits that she was absent and would sometimes not work while

she was absent.  *Id.* ¶ 78; Pl. Counter 56.1 Stmt. ¶ 78.  Johnson's subordinates went to Bethelmy-

Rada for direction and feedback, and he gave two of her subordinates their year-end reviews while

Johnson was out.  Def. 56.1 Stmt. ¶¶ 75-76.  Johnson's subordinates would discuss amongst

themselves their beliefs that Johnson was absent, would overpromise, and would overreact, and

that they were frustrated she would delete their emails without reading them.  *Id.* ¶ 79.  Johnson's

peers also complained to Bethelmy-Rada about Johnson's behavior.  *Id.* ¶ 80.

Johnson attributes these incidents to her worsening anxiety and depression.  Pl. Counter

56.1 Stmt. ¶¶ 47-48.  Johnson has seen a psychiatrist since August 2016, Pl. 56.1 Stmt. ¶ 373;

Johnson Declaration ¶¶ 49, 51-52, and attended therapy at least once a week while working at

L'Oréal, Johnson Declaration ¶¶ 62, 64.  Bethelmy-Rada knew Johnson was attending therapy.

Bethelmy-Rada Deposition Tr. at 74:2-75:24.  As a result of her depression, Johnson suffered from

insomnia/sleep disturbances, irritability, mood swings, periods of low mood, lack of motivation,

excessive worrying, weight/appetite disturbances, agitation, concentration problems, and

tiredness, fatigue, and low energy.  Pl. 56. Stmt. ¶ 384.  This made it difficult for her to navigate

work and to manage her workload.  *Id.* ¶ 385.  Johnson spoke with Morales about seeing a therapist beginning in 2017, in part because she felt a connection with Morales, who is Latina, because they are both women of color.  *Id.* ¶¶ 390, 392.  At some point before February 2018, Johnson told Morales she had depression.  *Id.* ¶ 393; Johnson Deposition Tr. at 149:18-21.

On February 28, 2020, Morales and Johnson met to discuss the incidents with Wykoff, Mallory Morales, and Bethelmy-Rada.  Def. 56.1 Stmt. ¶ 82.  During that meeting, Johnson told Morales that she did not understand why Wykoff complained about her.  *Id.* ¶ 84.  Johnson stated that she felt Wykoff had disrespected her and that "sometimes people need to be checked."  *Id.* ¶¶ 85-86.  Johnson also defended herself with regard to Mallory Morales's complaint, stating she had done nothing wrong during the meeting with Mallory Morales and Bethelmy-Rada.  *Id.* ¶¶ 87-88.  Johnson suggested the complaints were race-based on the basis that they were made by two individuals—Wykoff, who is Asian, and Mallory Morales—who are not African American.  *Id.* ¶ 89.  Morales assured Johnson that the complaints were not racially motivated.  *Id.* ¶ 90.  Morales also mentioned that Bethelmy-Rada was disappointed with Johnson's performance at the meeting with Jeanteur.  *Id.* ¶ 95.  In response, Johnson criticized Bethelmy-Rada's management style, calling him a micromanager who overrode her decisions.  *Id.* ¶ 96.  She also expressed that she felt his management style was demoralizing to the team and caused them stress.  *Id.* ¶ 97.[4]

During this meeting, Morales expressed concern for Johnson's wellbeing, Pl. Counter 56.1

---

[4] Johnson has since raised other issues with Bethelmy-Rada's behavior.  For instance, Johnson speculates that Bethelmy-Rada used cocaine at work and had a sexual relationship with a subordinate. Def. 56.1 Stmt. ¶¶ 299, 314.  She also contends that Bethelmy-Rada once watched pornography during a team meeting.  *Id.* ¶ 302.  During the meeting in question, the team was discussing a social media hair influencer who previously worked in pornography.  *Id.* ¶ 303.  One of the other employees apparently asked Bethelmy-Rada if he was watching porn on his phone, to which Bethelmy-Rada purportedly responded, in essence, "if your presentation was more interesting I wouldn't be watching porn."  Pl. Counter 56.1 Stmt. ¶ 304; Griggs Deposition Tr. at 183:19-184:13.

Stmt. ¶ 82, and gave Johnson constructive feedback, telling her that she needed to communicate better with her peers and cross-functional partners, Def. 56.1 Stmt. ¶ 91.  Johnson avers that during this meeting she told Morales that she was taking Prozac and was "tired of having to take drugs in order to cope at work."  Pl. Counter 56.1 Stmt. ¶ 92.  She expressed concern that her role was not right for her and asked if there were opportunities in another part of L'Oréal.  Def. 56.1 Stmt. ¶ 92. Morales suggested that Johnson connect with Angela Guy and Cecilia Nelson-Hurt, the Senior Vice President and Assistant Vice President of Diversity and Inclusion for L'Oréal, respectively. *Id.* ¶ 93.  Morales told Johnson she wanted to meet again in a few weeks, and the two scheduled a meeting for March 20, 2018.  *Id.* ¶ 98.  Morales told Johnson she would speak to Bethelmy-Rada about Johnson's concerns, *id.* ¶ 99, and did so later, at least in general terms, *id.* ¶ 101; Pl. Counter 56.1 Stmt. ¶ 101.

In March 2018, Johnson requested and received time off, and went to Jamaica.  Def. 56.1 Stmt. ¶ 110.  Johnson terms this as a "medical leave" because she took the trip at the recommendation of her therapist.  Pl. Counter 56.1 Stmt. ¶ 110.  Johnson was in Jamaica on March 20, 2018, when she and Morales were supposed to have their follow-up meeting.  Def. 56.1 Stmt. ¶¶ 102-103.  After Morales texted to confirm the meeting, Johnson requested to move the meeting and stated that she was having a "rough time."  *Id.*; Pl. Counter 56.1 Stmt. ¶ 103.  Johnson did not mention any other personal or health issues.  Def. 56.1 Stmt. ¶ 106.  Morales told Johnson to feel better, to let her know how she could help, and that Johnson should not hesitate to reach out.  *Id.* ¶ 104.  Johnson did not reach out to Morales after this text message and before their next meeting on April 4, 2018.  *Id.* ¶ 105.

While all of this was going on, Johnson was also dealing with ongoing issues with one of her subordinates, Jenna Diorio, the Manager for Innovation and Technology.  *Id.* ¶ 23.  The issues

between Johnson and Diorio date back to at least September 2017, when Johnson expressed concerns about Diorio's performance. *Id.* ¶ 266. Bethelmy-Rada told Johnson she had decision-making authority over Diorio's employment and asked Johnson if she wanted to replace Diorio. *Id.* ¶¶ 267-268. Johnson elected not to terminate Diorio at that time. *Id.* ¶ 267.

Human Resources was involved with the conflict between Johnson and Diorio as well. Morales spoke with Diorio about her performance issues, *id.* ¶ 270, and Morales and Johnson discussed how to handle Diorio, *id.* ¶ 271. Morales and Johnson decided that Johnson would rate Diorio as "below expectations" in her year-end review, meaning Diorio would not receive a salary increase. *Id.* However, in mid-December 2017, Johnson told Diorio that her performance had improved and that she would receive a several thousand dollar bonus. *Id.* ¶ 272. Morales warned Diorio at the end of the year that L'Oréal "needed to see things get better" and that a low rating would not be "sustainable over an extended period of time." *Id.* ¶¶ 274-275; Morales Deposition Tr. at 146:8-149:3; Morales Declaration ¶ 81.

Then, in late February or early March 2018, Johnson expressed that she wanted to fire Diorio and repurpose her role. Def. 56.1 Stmt. ¶ 276; Pl. Counter 56.1 Stmt. ¶ 276. Johnson was out of the office from March 19 through March 26, 2018, and upon her return reached out again about her desire to replace Diorio. Def. 56.1 Stmt. ¶ 277; Pl. Counter 56.1 Stmt. ¶ 277. But when Johnson did this, L'Oréal was reviewing each division's annual budget, and Bethelmy-Rada was worried about losing head count. Def. 56.1 Stmt. ¶ 279. He therefore did not permit Johnson to fire Diorio. *Id.* Around this time, Johnson transferred some duties, including data analytics and social media recording, from one of her subordinates, Nahema Conesa Alcolea, Manager for Digital and Social Media Matrix DMI, to Diorio. *Id.* ¶¶ 23, 107. Conesa Alcolea felt it was "not good" to transfer these duties to Diorio because Diorio did not know how to perform them. *Id.*

¶¶ 107-109.

Diorio went to Human Resources on April 2, 2018 to complain about Johnson.  *Id.* ¶ 111. Diorio spoke with Morales's colleague, Farida Mercedes, and raised several complaints about Johnson's behavior.  *Id.* ¶ 112.  Diorio said she felt Johnson excluded her from conversations with the rest of the team.  *Id.* ¶ 113; Pl Counter 56.1 Stmt. ¶ 113.  She stated that Johnson had an intern mail brownies laced with marijuana to Johnson's mother, without the intern's knowledge, which had upset the intern.  Def. 56.1 Stmt. ¶¶ 113, 115-116.  She complained that Johnson did not tell her team when she would not be in the office.  *Id.* ¶ 117.  Diorio also expressed fear that Johnson would retaliate against her for reporting Johnson to Human Resources.  *Id.*

During this meeting, Diorio also showed Mercedes printouts of text messages Johnson had sent her.  *Id.* ¶ 114; Morales Declaration ¶¶ 29-30.  These include text messages like, "[Wykoff] is about to get THESE HANDS."  Def. 56.1 Stmt. ¶ 232; Bethelmy-Rada Declaration, Exh. J.  It also included a text about Bartosz "Bart" Gutkowski, the then-Managing Director in Poland, saying, "I'm about to crawl so deep and so far into Bart's ass that he will think I live in his fucking small intestines[.]  Don't you even dare think of coming for me.  I will fucking destroy you."  *Id.* ¶¶ 233-234; Bethelmy-Rada Declaration, Exh. J.  Mercedes told Morales and their supervisor, Carol Realson, about her conversation with Diorio, and Human Resources opened an investigation into Johnson.  Def. 56.1 Stmt. ¶ 118.

Bethelmy-Rada, Morales, and Johnson met on April 4, 2018 to discuss the issues that had been raised about Johnson.  *Id.* ¶ 119.  Prior to this meeting, Morales told Bethelmy-Rada that someone had made a formal complaint about Johnson but attests that she did not show him the text messages.  *Id.* ¶¶ 120-121; Morales Declaration ¶ 32; Bethelmy-Rada Declaration ¶ 49.  During the meeting, Morales talked about, among other things, Johnson's absences, her lack of

engagement with her team, and her friction with team members and other leaders at the company. Def. 56.1 Stmt. ¶ 122.  Johnson contends that Morales also referenced Johnson's text messages. Pl. Counter 56.1 Stmt. ¶ 121.  Based on this, Johnson speculates that Bethelmy-Rada saw the text messages.  *See, e.g.*, *id.*  Johnson asked for more information, but Morales told her they were still investigating.  Def. 56.1 Stmt. ¶ 123.

At the end of the meeting, Johnson said she was having issues with her sister, who is disabled, and her mother.  *Id.* ¶ 124.  Bethelmy-Rada asked Johnson if she needed time off or other help, *id.* ¶ 125, but Johnson did not request time off, *id.* ¶ 126.  Johnson stated that she "was not feeling well" but did not mention she was undergoing medical treatment or was otherwise impacted by her depression.  *Id.* ¶ 127; Pl. Counter 56.1 Stmt. ¶ 127.  After the meeting, Bethelmy-Rada emailed Johnson's team, saying Johnson was going through a "rough personal moment" and asking them to be supportive since they are like "family."  Def. 56.1 Stmt. ¶ 128; Pl. Counter 56.1 Stmt. ¶ 128.  He wrote that he was "hoping that she feels better soon."  Bethelmy-Rada Declaration, Exh. E.  The team made sure the projects all moved forward and that they met all deadlines.  Def. 56.1 Stmt. ¶ 129.

On April 6, 2018, Johnson texted Morales that she was working with a doctor to make an "action plan" and asked for resources for her disabled sister.  Pl. Counter 56.1 Stmt. ¶ 126; Def. 56.1 Stmt. ¶¶ 130-131.  Morales told her she would email her some resources, which she did the next day, and that she hoped Johnson was feeling better.  Def. 56.1 Stmt. ¶¶ 132-134.  She told Johnson to let her know if there was anything she could do for her.  *Id.* ¶ 133.  Johnson texted that she would try to set up a time the following week to discuss her plan with Morales.  *Id.* ¶ 135. Morales responded, "I'm here when you are ready. I want you to feel better, that's the most important thing."  Pl. Counter 56.1 Stmt. ¶ 136; Morales Declaration, Exh. E.  Johnson never

shared an action plan with Morales.  Def. 56.1 Stmt. ¶ 137.  Johnson also never reached out for additional help and never used the resources Morales sent her.  *Id.* ¶¶ 138, 140.

During this time, Morales continued to investigate Diorio's complaints about Johnson.  She was unable to verify the authenticity of the text messages or confirm if Johnson had directed an intern to mail marijuana laced brownies.  *Id.* ¶¶ 141-144.  As part of the investigation, Morales met with the other members of Johnson's team:  Conesa Alcolea, Younge, and Taylor Griggs, who was the Global Digital Director for Matrix DMI.  *Id.* ¶¶ 23, 145.

These employees echoed similar concerns about Johnson's management style.  Younge called Johnson's team a "shit show," *id.* ¶ 147, emphasizing Johnson's lack of presence in the office and failure to help her team resolve issues, *id.* ¶ 148.  Griggs told Morales that Johnson had a "harsh" and "barky" communication style, that she was belittling, that she would cancel meetings five minutes before they were to start, and that she deleted emails without reading them.  *Id.* ¶¶ 150-151.  He also shared that he thought she did not manage Conesa Alcolea well, *id.* ¶ 152, and that Johnson would forget what she said during meetings, change her strategy constantly, and fail to show up for morning meetings, *id.* ¶ 153.  Finally, Conesa Alcolea provided a list of issues she had with Johnson, including that Johnson was not present, took time off without telling her or Diorio, and deleted all of her email without reading them after returning from vacation so she could "start over."  *Id.* ¶¶ 155-158.  Conesa Alcolea also felt that Johnson had bullied Diorio by excluding her from texts, giving her projects beyond her capabilities, cutting her off while speaking, and yelling at her.  *Id.* ¶ 160.  She also mentioned that Johnson would assign interns personal tasks.  *Id.* ¶ 161.

And Johnson's formal performance reviews around this time were similarly bleak.  Johnson's score in L'Oréal's Leadership Behavior Survey, which associates completed twice a

year, went from 4.3 out of 5 in May 2017 to 3.2 in April 2018.  *Id.* ¶¶ 162-164.  This was lower

than the average score of 4.2 for all mangers in the Professional Products Division.  *Id.* ¶ 165.

Morales reported these findings to Realson, who said they needed to have a conversation

with Johnson to address these issues.  *Id.* ¶ 166.  But Human Resources did not immediately speak

with Johnson.  L'Oréal attests that was because Johnson's team was preparing for Mondiale, the

Professional Products Division's worldwide meeting in Paris, France that took place at the end of

May.  *Id.* ¶ 167.  Johnson does not dispute this but asserts that the team's preparation for Mondiale

did not prevent Human Resources from speaking to her.  Pl. Counter 56.1 Stmt. ¶ 167.

Johnson and her team went to Paris for Mondiale at the end of May 2018, during which

time Bethelmy-Rada maintains that Johnson continued to act inappropriately.  Def. 56.1 Stmt.

¶ 168.  First, Bethelmy-Rada contends that Johnson missed most of a team meeting that Bethelmy-

Rada had scheduled for the afternoon of Friday, May 26, 2018.  *Id.* ¶ 171.  According to Bethelmy-

Rada, when Johnson eventually did show up, she put her head on the table and appeared to be

sleeping.  *Id.* ¶ 172.  Bethelmy-Rada believed Johnson had been drinking wine when she was

supposed to be in the meeting.  *Id.* ¶¶ 172-173; Bethelmy-Rada Declaration ¶ 34.  This was based

in part on a message Johnson posted on Twitter, which stated, "So here's the difference between

work travel when you're in your 20s and scared vs in your 30s and give minimal fucks.  Me and 2

other coworkers just landed and arrived at the hotel at 3:15p local time.  My boss: let's meet at

3:30.  Me currently:" and included a photo of herself drinking a glass of wine.  Def. 56.1 Stmt.

¶ 220; Bethelmy-Rada Declaration, Exh. K.  Johnson attests that she attended the entire meeting

and actively participated, and that she posted the tweet during a lunch break.  Pl. Counter 56.1

Stmt. ¶ 172; Johnson Declaration ¶¶ 243-245.

Second, there was an incident between Johnson and Nicolas Krafft, Vice President of

Business Development.  On Sunday morning, May 28, 2018, the team was to depart from Paris to Chantilly for Mondiale.  Def. 56.1 Stmt. ¶ 174.  Johnson was supposed to ride with Bethelmy-Rada, Krafft, and another individual, but Bethelmy-Rada overslept and the group left without him. *Id.* ¶¶ 174-177.  Then, Johnson and Krafft got into a dispute.

As Johnson relayed in texts to Bethelmy-Rada, Krafft was angry that Bethelmy-Rada was late to leave for the meeting.  *Id.* ¶ 180; Pl. Counter 56.1 Stmt. ¶ 180.  According to Johnson's texts, they left without Bethelmy-Rada, but they had to turn around because Krafft had left something at the hotel.  Def. 56.1 Stmt. ¶ 181.  While Krafft was in the hotel, Johnson went to a nearby grocery store.  *Id.*  Krafft then called Johnson's cell phone repeatedly "like the police" and when she returned, Krafft was "outside the van pacing—acting like he was about to walk into the store and force [her] out."  *Id.* ¶ 182; Pl. Counter 56.1 Stmt. ¶ 182.  She then "had it" with Krafft. *Id.*  Johnson explained that she told Krafft he had some "fucking nerve," and "went off on him," "cussed him out," and "it was NOT pretty."  Def. 56.1 Stmt. ¶ 183; Bethelmy-Rada Declaration, Exh. F.  Johnson texted a similar story to other employees, saying that she cursed at Krafft and "lit [Krafft's] fucking ass up."  Def. 56.1 Stmt. ¶ 186; Dkt. 105, Exh. N.  She also texted that she was "making angry noises" during the remainder of the trip so Krafft would know she was "still here and not to be fucked with."  Def. 56.1 Stmt. ¶ 187.

Although he missed the conflict between Johnson and Krafft, Bethelmy-Rada made it to Chantilly in time for the Matrix DMI preparation.  *Id.* ¶ 178.  Bethelmy-Rada tried to speak to Johnson when he arrived at Chantilly, but she was in her hotel room and told him she did not feel well.  *Id.* ¶ 191.  Bethelmy-Rada did speak to Krafft, who apparently gave Bethelmy-Rada the impression that his dispute with Johnson was not a significant incident.  *Id.* ¶¶ 188-190.  The rest of Mondiale occurred largely without incident, except that Bethelmy-Rada purportedly overslept

14

again the day after the fight between Johnson and Krafft and missed some additional workshops. *Id.* ¶ 198.[5]   A week later, Bethelmy-Rada texted the other individual who was in the car and witnessed the argument, and he too gave the impression the incident was not a big deal. *Id.* ¶¶ 196-197.

After Mondiale, Johnson went on vacation and was set to return on June 18 or 19, 2018. Pl. Counter 56.1 Stmt. ¶ 199.  Johnson texted Bethelmy-Rada during her vacation, saying that she thought Krafft had acted inappropriately and that she wanted to report Krafft's "sexist" and "intolerant" behavior, including that he was "rude" to her and "service workers." *Id.* ¶ 200.  She texted, "It is a problem: he is sexist, intolerant, and an overall negative energy on the team. . . . What—if anything—can be done to address this ongoing issue?  I feel that his sexist and intolerant behaviors are a liability to the Company, especially where diversity, inclusion and mutual respect are supposed to be valued." *Id.*  Bethelmy-Rada responded that he wanted to speak with Johnson about her message when she returned to better understand the issue. Def. 56.1 Stmt. ¶¶ 204-206.

After the trip, Bethelmy-Rada reported to Morales that he was "worried about [Johnson's] emotional state + a minor incident in the way she spoke to Nicolas Krafft." Pl. Counter 56.1 Stmt. ¶ 207.  He further wrote to Morales that he wanted to "prevent this from happening again and would like to brainstorm solutions with [Morales] and propose something to [Johnson] until she feels good/better." *Id.*  He expressed that he would "prefer to prevent anything that could happen at this point not to compromise her image and the teams." *Id.*  Morales responded that she was

---

[5] The record also reflects that Bethelmy-Rada missed several scheduled meetings with executives during a previous trip to Paris in March 2018.  Def. 56.1 Stmt. ¶ 306.  He initially told his colleagues that he missed the meetings because he was throwing up all night, but later admitted he had lied and was in fact helping a friend detained at the police station for a drug-related incident. *Id.* ¶ 310.  He told his boss and other high-level executives that he had been at the police station with a friend and apologized for missing the meetings. *Id.* ¶ 311.  He was verbally reprimanded for this behavior. *Id.*

"very concerned" about the situation and that Johnson was "isolating her team, her colleagues and her cross functional partners." *Id.* ¶ 210.  Morales worried that "optically it is starting to appear that [they were] letting [Johnson] not come to work and [were] not addressing her behavior." *Id.*

On June 13, 2018, while Johnson was still on vacation, Diorio requested another meeting with Mercedes to discuss tweets that Johnson had posted from her public Twitter account. *Id.* ¶¶ 215, 222-223; Pl. Counter 56.1 ¶ 222; Dkt. 112, Exh. 30 ("Diorio Deposition Tr.") at 218:18-24.  For instance, on May 15, 2018, Johnson tweeted about her old and new "weed guy[s]." Def. 56.1 Stmt. ¶ 217.  On May 16, 2018, Johnson tweeted about the riots after the Rodney King verdict, saying that the verdict "got me hating white people currently." *Id.* ¶ 218; Johnson Deposition Tr. at 249:7-13.  She tweeted about Meghan Markle and Prince Harry's wedding, saying, "Those racist British muthafackas hated that ceremony." Def. 56.1 Stmt. ¶ 219; Johnson Deposition Tr. at 249:14-22.  And, although she did not say L'Oréal explicitly, Johnson tweeted about her "POS" employer that did not fly her to Paris on a first-class plane ticket. Def. 56.1 Stmt. ¶ 238.  Diorio reported these tweets to L'Oréal's ethics department the following day, June 14, 2018. *Id.* ¶ 226.

Then, on June 15, 2018, Diorio shared Johnson's tweets and text messages with Bethelmy-Rada. *Id.* ¶¶ 227-229.  Bethelmy-Rada attests that he found these texts to be shocking, wholly inappropriate, and physically threatening. *Id.* ¶¶ 230-231; Bethelmy-Rada Declaration ¶ 50.  After receiving this information, Bethelmy-Rada went to Morales to discuss them, and told Morales that Johnson's behavior was unacceptable and that Johnson could not stay on his team. Def. 56.1 Stmt. ¶¶ 242-244.  Bethelmy-Rada, Morales, and Diorio then met with Christina Feege, L'Oréal's in-house counsel, to discuss the text messages. *Id.* ¶ 246.  After Diorio left the meeting, the others concluded that Johnson had to be let go. *Id.* ¶ 249.

Morales emailed Bethelmy-Rada and Realson, Morales's manager, on Sunday, June 17,

16

2018 to let them know she would terminate Johnson the following day.  *Id.* ¶ 253.  At the time, Bethelmy-Rada was in Paris for various previously scheduled meetings.  *Id.* ¶ 252.  But Morales did not speak with Johnson on June 18 because Johnson was flying back to the United States from her vacation that day.  *Id.* ¶ 255.  Instead, early Tuesday morning, Morales texted Johnson to let her know they would meet at 9:00 a.m. with Realson and Bethelmy-Rada and that it would be a difficult conversation.  *Id.* ¶ 256.  Johnson elected to have that meeting via telephone rather than come into the office.  *Id.* ¶ 257.  Realson and Morales told Johnson she was being terminated for her communication issues, her inappropriate behavior with others, and her time away from the office.  *Id.* ¶ 259.  Morales contends that they discussed Johnson's inappropriate texts and social media posts, *id.*, but Johnson asserts they were not mentioned, Pl. Counter 56.1 Stmt. ¶ 259. Johnson said little else except "God Bless You."  Def. 56.1 Stmt. ¶ 261.  Bethelmy-Rada did not join the call because of previously scheduled meetings in Paris.  *Id.* ¶ 262.

Finally, the record reflects that in March 2019, almost a year after Johnson was terminated, L'Oréal investigated a complaint of race discrimination made against Krafft.  *Id.* ¶ 288.  The investigation began after a manager, Steve Doan, reported that an associate, Angel Rivera, had overheard a phone call in which Krafft made negative comments about people from Brazil and Mexico, and derogatory comments about "dark people."  *Id.* ¶ 289.  Morales investigated the complaint and spoke to Krafft and Mariko Rex, the individual to whom Krafft had allegedly made these comments.  *Id.* ¶ 290.  Krafft and Rex told Morales they were discussing their go-to market strategy for a line of vivid hair colors and lightening products launching in Latin and South America, and that they were speaking about how hair colors would do in these markets.  *Id.* ¶ 291. Krafft and Rex both averred that Krafft was not using derogatory terms about skin color.  *Id.* ¶¶ 293-295.  Morales also spoke to Doan and Rivera, as well as another individual who also

overheard the phone call.  *Id.* ¶ 296.  Morales concluded that, based on her investigation, Krafft was not referring to dark skin but rather dark hair, in the context of how hair lightening products would do in that market.  *Id.* ¶ 298.

## B.  Procedural History

Johnson filed suit in October 2018.  Dkt. 1.  This case was initially assigned to the Honorable Deborah A. Batts.  Johnson filed her Amended Complaint on June 25, 2019.  Dkt. 20.  The Amended Complaint brings claims for race discrimination and retaliation under Title VII, 42 U.S.C. § 1981, the New York State Human Rights Law ("NYSHRL"), and the NYCHRL, as well as disability discrimination and retaliation under the Americans with Disabilities Act ("ADA") and State and City law.  *Id.* ¶¶ 266-313.  The case was reassigned to the Honorable Lorna G. Schofield on February 20, 2020, and then reassigned to the undersigned on September 29, 2020.  On February 16, 2021, after the close of discovery, L'Oréal moved for summary judgment.  The motion was fully briefed on April 20, 2021.

## II.  Applicable Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine dispute exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' while a fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Chen v. 2425 Broadway Chao Rest., LLC*, No. 16 Civ. 5735 (GHW), 2019 WL 1244291, at *4 (S.D.N.Y. Mar. 18, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The Court must "resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought."  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

"The movant bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,' and if satisfied, the burden then shifts to the non-movant to present 'evidence sufficient to satisfy every element of the claim.'" *Chen*, 2019 WL 1244291, at *4 (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008)).  The non-movant "may not rely on conclusory allegations or unsubstantiated speculation," and "must offer some hard evidence showing that its version of the events is not wholly fanciful." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (internal quotation marks and citations omitted).  The non-movant must present more than a "scintilla of evidence." *Anderson*, 477 U.S. at 252.  "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks and citation omitted).

## III.  Discussion

### A.  Johnson's Race Discrimination Claims Under Title VII, Section 1981, and the NYSHRL

Johnson contends that L'Oréal violated Title VII, section 1981, and the NYSHRL by discriminating against her on the basis of race.[6]  "Title VII makes it unlawful for an employer 'to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [the individual's] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (quoting 42 U.S.C. § 2000e–2(a)(1)).  Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall

---

[6] Johnson clarified in her opposition to L'Oréal's motion for summary judgment that she "does not assert a hostile work environment claim under Title VII, nor does she assert separate hostile work environment claims under the NYCHRL or NYSHRL.  Rather, for her State and City claims, she alleges that Defendant discriminated against her on the basis of race, including by creating a hostile work environment."  Dkt. 110 ("Opposition") at 12 n.9.

have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Section 1981 thus protects against "discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." *Patterson v. Cty. of Oneida*, 375 F.3d 206, 224 (2d Cir. 2004). The NYSHRL similarly makes it unlawful for an employer to refuse to hire or discriminate against an employee because of his or her race. N.Y. Exec. Law § 296.

In assessing discrimination claims under Title VII, section 1981, and the NYSHRL, courts employ the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012). The burden is first on the plaintiff to establish a *prima facie* case of racial discrimination. To do so, "a claimant 'must show: (1) [s]he belonged to a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.'" *Id.* (quoting *Holcomb*, 521 F.3d at 138); *see McDonnell Douglas Corp.*, 411 U.S. at 802. This requirement is "not onerous." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).

If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant "to articulate 'some legitimate, non-discriminatory reason' for its action." *Holcomb*, 521 F.3d at 138 (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802). "If such a reason is provided, plaintiff may no longer rely on the presumption raised by the prima facie case, but may still prevail by showing, without the benefit of the presumption, that the employer's determination was in fact the result of racial discrimination" and that the employer's proffered reasons were pretext. *Id.* "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.

### 1. Johnson's *Prima Facie* Case

It is undisputed that Johnson has successfully shown the first three elements of the *prima facie* test: Johnson is an African American woman with more than a decade of experience in digital marketing, business development, and broadcast journalism. Pl. 56.1 Stmt. ¶¶ 318-320. And L'Oréal fired Johnson on June 19, 2018. Def. 56.1 Stmt. ¶¶ 258-265. The parties dispute only whether Johnson has shown that her termination occurred under circumstances giving rise to an inference of discriminatory intent. The Court assumes, without deciding, that Johnson has established a *prima facie* case. *See Maynard v. Montefiore Med. Ctr.*, No. 18 Civ. 8877 (LAP), 2021 WL 396700, at *10 (S.D.N.Y. Feb. 4, 2021) ("Caselaw from the Court of Appeals 'makes clear that a court may simply assume that a plaintiff has established a prima facie case and skip to the final step in the *McDonnell Douglas* analysis, as long as the employer has articulated a legitimate, nondiscriminatory reason for the adverse employment action.'" (quoting *Howard v. MTA Metro-N. Commuter R.R.*, 866 F. Supp. 2d 196, 205 (S.D.N.Y. 2011)).

### 2. L'Oréal's Proffered Reasons

L'Oréal has provided ample reasons for terminating Johnson that were not based on her race. Johnson sent a subordinate several text messages sounding in physical violence toward colleagues. Def. 56.1 Stmt. ¶¶ 228, 247; Bethelmy-Rada Declaration, Exh. L. These include text messages like "[Wykoff] is about to get THESE HANDS," and "I'm about to crawl so deep and so far into [a Managing Director]'s ass that he will think I live in his fucking small intestines[.] Don't you even dare think of coming for me. I will fucking destroy you." Bethelmy-Rada Declaration, Exh. J. She also made several posts on social media that L'Oréal found troubling. This included tweeting a photo of herself drinking a glass of wine during a workday in Paris, which her boss believed was taken while she was supposed to be at a meeting. Def. 56.1 Stmt. ¶ 220;

Bethelmy-Rada Declaration, Exh. K.  She also made statements referring to British people as "racist British muthafuckas," Def. 56.1 Stmt. ¶¶ 219, "hating white people," *id.* ¶ 218, and working for a "POS company," Bethelmy-Rada Declaration, Exh. K.

Courts have held that "[t]he decision to terminate a senior manager who fails to comply with company policy or who sends inappropriate emails is a legitimate, non-discriminatory reason for termination." *Deluca v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*, No. 06 Civ. 5474 (JGK), 2008 WL 857492, at *10 (S.D.N.Y. Mar. 31, 2008); *see, e.g.*, *Vosatka v. Columbia Univ.*, No. 04 Civ. 2936 (LAP), 2005 WL 2044857, at *9 (S.D.N.Y. Aug. 25, 2005) (finding that the university had provided a non-discriminatory reason for terminating an employee based in part on the employee's sexually explicit emails).  The text messages and posts here, some of which included threats to other employees, provide ample support for L'Oréal's decision to fire Johnson.

And Johnson's text messages and social media posts were not the only reasons for her termination.  The record is replete with evidence of Johnson's misconduct and performance issues. During the last six months of her employment, numerous people at L'Oréal, including Johnson's colleagues and subordinates, complained to L'Oréal's Human Resources and to Bethelmy-Rada about Johnson's behavior.  Def. 56.1 Stmt. ¶¶ 74-75, 79-95, 117, 141-166.  This included complaints about her frequent absences, lack of presence, and jumps in mood.  *Id.* ¶¶ 74-75. Johnson's subordinates also complained that, among other things, Johnson canceled meetings at the last minute, did not show up for meetings, did not inform her team when she would not be present, did not set realistic deadlines, did not have clear business priorities, did not handle her subordinates well, deleted all of her emails after returning from vacation without reading them, and was not prepared for meetings.  *Id.* ¶¶ 117, 145-159.  Wykoff complained about Johnson's disrespectful behavior.  *Id.* ¶¶ 82-86.  Mallory Morales complained about Johnson "going too far"

at a meeting with Bethelmy-Rada.  Pl. Counter 56.1 Stmt. ¶¶ 87-89.  Johnson's score in L'Oréal's

Leadership Behavior Survey, which associates completed twice a year, went from 4.3 out of 5 in

May 2017 to 3.2 in April 2018, substantially below the average score of 4.2 for all mangers in the

Professional Products Division.  Def. 56.1 Stmt. ¶¶ 162-165.

While Johnson may believe that her colleagues' complaints were unfounded or that these

actions were not worthy of dismissal, the Second Circuit has made clear that in a discrimination

case, courts are "interested in what '*motivated* the employer'; the factual validity of the underlying

imputation against the employee is not at issue."  *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d

211, 216 (2d Cir. 2006) (quoting *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S.

711, 716 (1983)); *accord Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 169 (2d Cir. 2001).  L'Oréal

has thus "rebut[ted] the presumption of discrimination by producing evidence that [Johnson] was

[terminated] for a legitimate, nondiscriminatory reason."  *Burdine*, 450 U.S. at 255.

### 3.  Pretext

Johnson claims that there is evidence showing that L'Oréal's proffered reasons for

terminating her are pretext because (1) there is direct evidence of bias, (2) L'Oréal's stated reasons

are not credible, and (3) L'Oréal did not raise these performance concerns to Johnson to allow her

to remedy them.

### i.  Purported Direct Evidence of Racial Discrimination

Johnson contends that she has provided direct evidence of racial discrimination.  Johnson

first points to comments that Wykoff and Krafft made regarding race.  Opposition at 13-14.

Johnson asserts that Wykoff asked why Johnson and a Black intern had the "same hair," Pl. 56.1

Stmt. ¶ 354; *see* Diorio Deposition Tr. at 56:15-57:5; Dkt. 113, Exh. 82, and that Wykoff "basically

ma[de] fun of [her] hair, saying that [her] hair looked like an older black person's hairstyle and

not someone [her] age," Johnson Deposition Tr. at 71:14-72:8.  Johnson further testified that

Wykoff said another Black woman, who wore her hair in natural curls, looked like the clown from

the television show, The Simpson's.  *Id.* at 70:14-18.  And Johnson also points to the allegedly

derogatory comments an associate reported hearing Krafft make on a phone call in March 2019—

a year after Johnson was terminated—about "dark people" and people from Mexico.  *See* Morales

Declaration ¶¶ 84-85.

To support an inference of discriminatory intent, there must be a nexus between the

discriminatory comments and the adverse employment action.  *See Danzer v. Norden Sys., Inc.*,

151 F.3d 50, 56 (2d Cir. 1998); *Nidzon v. Konica Minolta Bus. Sols., USA, Inc.*, 752 F. Supp. 2d

336, 351 (S.D.N.Y. 2010).  In assessing whether remarks are probative, courts consider (1) "who

made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker)"; (2) "when the

remark was made in relation to the employment decision at issue"; (3) "the content of the remark

(i.e., whether a reasonable juror could view the remark as discriminatory)"; and (4) "the context

in which the remark was made (i.e., whether it was related to the decision-making process)."

*Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149-50 (2d Cir. 2010).  While none of these factors

are dispositive, "this framework will often provide a useful approach to the admission or exclusion

of remarks not directly related to the adverse action against the plaintiff."  *Id.* at 150.

The comments Johnson highlights were not made by any decision-makers.  Remarks by

someone other than a decision-maker "may have little tendency to show that the decision-maker

was motived by the discriminatory sentiment expressed in the remark."  *Tomassi v. Insignia Fin.*

*Grp.*, 478 F.3d 111, 115 (2d Cir. 2007), *abrogated on other grounds by Gross v. FBL Fin. Servs.,*

*Inc.*, 557 U.S. 167, 177-78 (2009); *accord Henry*, 616 F.3d at 149-50.  And Johnson has not

suggested these remarks were made in connection with the decision to fire her.  Indeed, Krafft's

24

allegedly racist comments occurred an entire year after Johnson's termination. Thus, even accepting these comments were racial in nature, they do not give rise to an inference of discriminatory intent in connection with her termination.

Johnson also contends that Bethelmy-Rada, Morales, and Johnson's peers all used racially coded language when speaking about her and applied a double-standard toward her. Opposition at 14 (citing Def. 56.1 Stmt. ¶ 44; Pl. 56.1 Stmt. ¶¶ 434, 440, 522, 539, 681, 689, 692, 706-707). According to Johnson, L'Oréal prided itself on its aggressive French culture and praised non-African American employees for being direct and demanding, while criticizing Johnson as "aggressive" and "defensive." *Id.*

But the evidence to which Johnson cites does not support these assertions. This evidence reflects only that (1) some employees, including Johnson, viewed Bethelmy-Rada's, Tayara's, and Krafft's personalities and leadership styles—which embodied, according to Johnson, L'Oréal's proud "uniquely French culture," *id.*—as passionate but sometimes problematic, *see* Pl. 56.1 Stmt. ¶¶ 434, 440, 689, 692, 706-707, and that (2) Bethelmy-Rada had issues with Johnson's tone and communication style, particularly toward the end of Johnson's tenure at L'Oréal, *see* Def. 56.1 Stmt. ¶ 44; Pl. 56.1 Stmt. ¶¶ 522, 539, 681. Johnson does not cite to any statements from Morales, leaving the Court unable to infer that Morales applied a double standard to her behavior. And the Court cannot infer that Bethelmy-Rada subjected Johnson to a higher standard simply by comparing *other employees'* views about Bethelmy-Rada to *Bethelmy-Rada's* views about Johnson. Thus, while Johnson may have felt that others used racially-coded language toward her and did not treat her fairly, she has not provided any evidence that would give rise to an inference that L'Oréal terminated her because of her race rather than because of her misconduct.

### ii.  "Credibility" of L'Oréal's Stated Reasons

Johnson also argues that L'Oréal's stated reasons are not credible.  First, Johnson asserts that the text messages were pretext because "L'Oréal—including Bethelmy-Rada—knew of the text messages months prior, in April, and took no disciplinary action."  Opposition at 25.  But as noted above, the record does not reflect that Bethelmy-Rada had seen the text messages or knew their full scope.  And even if he had, there is nothing to suggest that her termination was racially motivated.  The record makes clear that Human Resources started investigating Johnson after Diorio reported the texts and that it attempted to confirm Diorio's allegations.  Def. 56.1 Stmt. ¶ 118.  And the subsequent investigation confirmed issues that had been previously raised regarding Johnson's performance at work, including her frequent absences, her lack of engagement with her team, the fact her team felt they were not being managed or supported, and the tension she had with team members, peers, and other leaders within the company.  *Id.* ¶ 122.

Second, Johnson asserts that L'Oréal did not reprimand, and even rewarded, others who engaged in similar or worse behavior.  For instance, Johnson contends that L'Oréal has a "permissive attitude towards the inflammatory posts of its spokespeople."  Opposition at 27.  In support, she points to an Instagram post of a former model that, in response to a Black Lives Matter post from L'Oréal, wrote "FUCK YOU @lorealparis," saying, "You dropped me from a campaign in 2017 and threw me to the wolves for speaking out about racism and white supremacy."  Dkt. 114, Exh. 119 at 2.  In that post, the former model stated that L'Oréal was a "RACIST AF brand[]" that was jumping on the "bandwagon."  *Id.*  According to a later post by this same individual, L'Oréal hired her to serve as a consultant on L'Oréal U.K.'s Diversity and Inclusion Board.  *Id.* at 10.  L'Oréal's decision to hire someone who spoke out against L'Oréal's diversity issues to advise the company on improving its diversity and inclusion efforts hardly suggests that L'Oréal

terminated Johnson because she was African American.

Johnson also compares herself to Bethelmy-Rada, Tayara, and Krafft, arguing that L'Oréal tolerated the poor behavior and abrasive management styles of these men, who are not African American. "When considering whether a plaintiff has raised an inference of discrimination by showing that she was subjected to disparate treatment, [the Second Circuit has] said that the plaintiff must show she was 'similarly situated in all material respects' to the individuals with whom she seeks to compare herself." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir. 1997)). Whether another employee is "similarly situated" is based on (1) "whether the plaintiff and those [she] maintains were similarly situated were subject to the same workplace standards" and (2) "whether the conduct for which the employer imposed discipline was of comparable seriousness." *Id.* at 40. "Although the question of whether two employees are similarly situated 'ordinarily presents a question of fact for the jury,' a Title VII plaintiff must nevertheless present at least *some* evidence by which a reasonable factfinder could determine that she was similarly situated to other employees outside of her protected class who were treated preferentially to her." *Goldman v. Admin. for Children's Servs.*, No. 04 Civ. 7890 (GEL), 2007 WL 1552397, at *6 (S.D.N.Y. May 29, 2007) (quoting *Graham*, 230 F.3d at 39).

Simply put, the record does not contain evidence that would allow a jury to find that these employees were similarly situated to Johnson in all material respects. While they may have had abrasive management styles, Johnson has not provided evidence that these individuals engaged in the same misconduct, *i.e.*, sending threatening text messages and making offensive social media posts. *See, e.g.*, *Sealy v. Hertz Corp.*, 688 F. Supp. 2d 247, 256 (S.D.N.Y. 2009) ("Plaintiff and his manager occupy different levels within the company and are not alleged to have committed the

same rule infractions.  Thus, there is no basis i[n] the record from which to conclude that they are 'similarly situated' for purposes of the *McDonnell Douglas* analysis.").

The behavior these men did engage in is quite different.  For instance, Bethelmy-Rada missed multiple work events in Paris after he overslept.  *See* Opposition at 27-28.  But the record does not reflect that he missed any meetings he was required to attend.  Def. 56.1 Stmt. ¶¶ 177-178, 198.  And when he missed a meeting with high-level executives for helping a friend arrested on a drug charge, he apologized and was reprimanded for this behavior.  *Id.* ¶ 311.  Johnson, on the other hand, was accused of persistent absenteeism, among other things.

Johnson also speculates that Bethelmy-Rada used cocaine at work, had a relationship with a subordinate, and appeared to be viewing pornography during a work meeting.  Opposition at 28.  But while Johnson suspected Bethelmy-Rada used cocaine at work, she did not inform L'Oréal of her suspicions.  Def. 56.1 Stmt. ¶ 314; *see Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 82 (2d Cir. 2005) ("[A] defendant's discriminatory intent cannot be inferred, even at the *prima facie* stage, from circumstances unknown to the defendant.").  And she admits that she had no proof he had a sexual relationship with a subordinate.  Def. 56.1 Stmt. ¶ 299.  She also admits that she did not actually see any pornography on his phone during the meeting in question.  *Id.* ¶¶ 302-305.

Third and finally, Johnson argues that a jury could infer the text messages are pretext because L'Oréal "never raised alleged performance concerns with Johnson or ask[ed] her for her side."  Opposition at 29.  But this is belied by the record.  On February 28, 2020, Morales and Johnson met to discuss the concerns Wykoff, Mallory Morales, and Bethelmy-Rada had raised.  Def. 56.1 Stmt. ¶ 82.  Morales scheduled another meeting to follow-up on this discussion, but Johnson went on vacation.  *Id.* ¶¶ 102-103.  Morales and Bethelmy-Rada raised their concerns again during the meeting on April 4, 2018.  *Id.* ¶ 119.

In sum, while Johnson suspects that her race played a role in her termination, Johnson cannot rely on speculation alone to prove her discrimination claim. *See Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) ("[A] plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment."); *Goldman*, 2007 WL 1552397, at *6 ("Although the Court is mindful that employment discrimination can be especially difficult to prove 'since an employer who discriminates against its employee is unlikely to leave a well-marked trail,' a plaintiff in an employment discrimination case cannot satisfy her burden through speculation and conjecture." (quoting *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir. 2000))).

The Court therefore grants summary judgment in favor of L'Oréal on Johnson's discrimination claims under Title VII, section 1981, and the NYSHRL.

## B. Johnson's Disability Discrimination Claims Under the ADA and the NYSHRL

### 1. Johnson's Disability Discrimination Claim

Johnson also argues that in firing her, L'Oréal discriminated against her on the basis of her disability in violation of the ADA. The ADA prohibits discrimination against a "qualified individual with a disability . . . by reason of such disability." 42 U.S.C. § 12132. ADA employment discrimination claims are also subject to the *McDonnell Douglas* burden-shifting framework. *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006). To establish a *prima facie* case of disability discrimination under the ADA, Johnson "must show by a preponderance of the evidence that: '(1) [her] employer is subject to the ADA; (2) [she] was disabled within the meaning of the ADA; (3) [she] was otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodation; and (4) [she] suffered adverse employment action because of [her] disability.'" *Id.* (quoting *Giordano v. City of New York*, 274 F.3d 740, 747 (2d

Cir. 2001)).  "New York State disability discrimination claims are governed by the same legal standards as federal ADA claims." *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 117 n.1 (2d Cir. 2004); *see, e.g.*, *Limauro v. Consol. Edison Co. of N.Y., Inc.*, No. 20 Civ. 3558 (CM), 2021 WL 466952, at *3 (S.D.N.Y. Feb. 9, 2021).

While L'Oréal does not contest that Johnson's depression was a disability under the ADA, *see* Dkt. 99 at 15, it asserts that it did not terminate Johnson because of her depression.  Even assuming Johnson has established a *prima facie* case of disability discrimination, she again cannot demonstrate that L'Oréal's reasons for firing her—her text messages and social media posts, as well as her performance difficulties—are pretext.  Johnson's entire argument in opposing dismissal is that her absences and performance issues were caused by her disability.  *See* Opposition at 5.  In other words, Johnson suggests that L'Oréal was not permitted to fire her on the basis of her performance issues if they stemmed from her depression.

But "workplace misconduct is a legitimate and nondiscriminatory reason for terminating employment, even when such misconduct is related to a disability."  *McElwee v. Cty. of Orange*, 700 F.3d 635, 641 (2d Cir. 2012); *see also id.* at 641 n.3 ("[M]isconduct—even misconduct related to a disability—is not itself a disability and may be a basis for dismissal." (quoting *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 465 (4th Cir. 2012))); *Sista*, 445 F.3d at 172 (holding that the ADA "does not . . . require that employers countenance dangerous misconduct, even if that misconduct is the result of a disability").  Simply put, even if Johnson's depression contributed to her actions, that does not shield her from termination.

Johnson avers that the timing of Diorio giving Bethelmy-Rada the text messages—"on the heels of Bethelmy-Rada's and Morales's email exchange about taking action because of Johnson's absences"—could allow a jury to conclude either that "a) Bethelmy-Rada asked Diorio for them

30

to create a pretext, or b) Diorio, driven by impermissible animus, brought them to Bethelmy-Rada in an effort to cause Johnson's termination."  Opposition at 26-27.  This is pure speculation.  There is simply nothing in the record to support that Bethelmy-Rada fired her because she was depressed, rather than because she engaged in significant misbehavior.  Again, Johnson's theory is based on her flawed reasoning that so long as her disability caused her misbehavior, she cannot be fired for that misbehavior.  While the ADA and New York State law do provide employees with certain protections, they are not absolute shields from termination.

## 2. Johnson's Disability Accommodation Claim

Johnson also contends that she was denied a reasonable accommodation for her depression and anxiety.  Discrimination under the ADA includes failing to make a reasonable accommodation that would permit a qualified disabled individual "to have access to and take a meaningful part in public services." *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 85 (2d Cir. 2004); *see also* 42 U.S.C. § 12112(b)(5)(A) (defining "discriminate" as including "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee").  "A 'reasonable accommodation' is one that gives the otherwise qualified plaintiff with disabilities 'meaningful access' to the program or services sought." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 282 (2d Cir. 2003) (quoting *Alexander v. Choate*, 469 U.S. 287, 301 (1985)).

"Although it is generally 'the responsibility of the individual with a disability to inform the employer that an accommodation is needed,' under certain circumstances, an employer is required to act proactively and engage in an interactive process to accommodate the disability of an employee even if the employee does not request accommodation." *McElwee*, 700 F.3d at 641-42 (quoting *Brady v. Wal-Mart Stores, Inc.,* 531 F.3d 127, 135 (2d Cir. 2008)).  "An employer

engages in an interactive process by, for example, 'meeting with the employee who requests an accommodation, requesting information about the condition and what limitations the employee has, asking the employee what he or she specifically wants, showing some sign of having considered the employee's request, and offering and discussing available alternatives when the request is too burdensome.'"  *Sheng v. M&TBank Corp.*, 848 F.3d 78, 87 n.3 (2d Cir. 2017) (quoting *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 218-19 (2d Cir. 2001)).  "[A]n employer's failure to engage in a good faith interactive process can be introduced as evidence tending to show disability discrimination and that the employer has refused to make [a reasonable] accommodation."  *Id.* at 87 (second alteration in original) (citations and internal quotation marks omitted).

Johnson contends that L'Oréal "did nothing to accommodate Johnson in the workplace or provide her with meaningful assistance or information about her rights, even after she explained to [Human Resources] and others that she was taking anti-depressants just to come to work."  Opposition at 11 (citing Pl. Counter 56.1 Stmt. ¶¶ 92, 106, 139; Pl. 56.1 Stmt. ¶¶ 400-403, 500).  Johnson further asserts that "L'Oréal ignored the situation until it needed an excuse to fire her, failing to take any meaningful steps to provide an accommodation."  *Id.* at 12.

But, again, this is belied by the record.  L'Oréal plainly engaged in an interactive process with Johnson.  For instance, Morales met Johnson for lunch on February 28, 2018, during which time Morales seemed "concerned" about Johnson's "wellbeing" and asked if she was okay.  Pl. Counter 56.1 Stmt. ¶ 82.  Morales offered Johnson internal resources to help her understand and maneuver within L'Oréal's culture, and provided her with the names of the company's Senior Vice President and Assistant Vice President of Diversity and Inclusion.  Def. 56.1 Stmt. ¶ 93.  Morales then scheduled a follow-up meeting for March 20, 2018 to touch base.  *Id.* ¶ 98.  It was Johnson

who rescheduled that meeting.  *Id.* ¶¶ 102-103.  And when Johnson said she was having a "rough time," Morales responded that she hoped Johnson felt better and to let her know how to help.  *Id.* ¶¶ 102-104.  Johnson did not reach out.  *Id.* ¶ 105.  Then, when Bethelmy-Rada and Morales met with Johnson on April 4, 2018, Bethelmy-Rada and Morales asked Johnson what they could do to help Johnson and if she needed time off, and they discussed with Johnson available resources.  *Id.* ¶ 125; Bethelmy-Rada Declaration ¶ 31.  Johnson did not ask for any time off or for any additional resources during that meeting.  Def. 56.1 Stmt. ¶ 126.  Finally, Bethelmy-Rada's actions after this time also reflect that he supported and attempted to work with Johnson.  For example, he emailed the team on April 4, 2018 stating:  "As you know, Amanda [Johnson] is going through a rough personal moment right now.  I know this can be disruptive for you on your daily work but I think we should all show our support to her. . . .  I am here to help as much as I can during her absence, so please copy me in everything you need validation of, any question, comment. . . .  I'm here."  Bethelmy-Rada Declaration, Exh. E.  Bethelmy-Rada further expressed his "hop[e] that [Johnson] feels better soon."  Pl. Counter 56.1 Stmt. ¶ 128.

After the April 4, 2018 meeting, Johnson voiced her desire to work with her doctor to improve her condition, to which L'Oréal responded positively.  After Johnson texted Morales that she was working on an "action plan" with her doctor, Morales sent Johnson various resources, including those related to L'Oréal's counseling program.  Def. 56.1 Stmt. ¶¶ 130-134.  Morales also sent Johnson a supportive message:  When Johnson told Morales, "I want to get myself together and realize I need help," Morales responded, "I'm here when you are ready.  I want you to feel better, that's the most important thing."  Pl. Counter 56.1 ¶ 136.  Yet, Johnson never shared an action plan with Morales and never asked Morales for any help or for any accommodation.  Def.

56.1 Stmt. ¶¶ 137-138.  Nor did she use the resources that Morales provided her.  *Id.* ¶ 140.[7]

Thus, the record reflects that L'Oréal reached out to provide several resources to Johnson and asked her what she needed.  That Johnson failed to take advantage of those resources or ask for an additional accommodation does not mean that L'Oréal denied her a reasonable accommodation.

### 3.  Johnson's Associational Discrimination Claim

Johnson also contends that L'Oréal discriminated against her because she needed time off to care for her disabled sister.  Under the ADA, "It is unlawful for a covered entity to . . . discriminate against, a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a family, business, social or other relationship or association."  29 CFR § 1630.8.  The NYSHRL contains a similar provision.  *See* N.Y. Comp. Codes R. & Regs. tit. 9, § 466.14.  To make out a *prima facie* case of "associational discrimination" under the ADA, a plaintiff must show: (1) "that she was qualified for the job at the time of an adverse employment action"; (2) "that she was subjected to adverse employment action"; (3) "that she was known at the time to have a relative or associate with a disability"; and (4) "that the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision."  *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 432 (2d Cir. 2016).

In opposing L'Oréal's motion for summary judgment on her associational discrimination claim, Johnson relegates her argument to a footnote, broadly arguing only that material disputes of fact exist as to whether L'Oréal fired her because of her relationship with her disabled sister.

---

[7] Although L'Oréal does not press the issue, it is not clear what accommodation Johnson believes would have been reasonable.  It is on the employee to show that a reasonable accommodation existed at the time of his dismissal.  *See McElwee*, 700 F.3d at 641-42.

*See* Opposition at 9 n.6.   But there is nothing in the record supporting this assertion beyond Johnson's speculation that she was treated poorly after returning from caring for her sister.   Indeed, the record reflects the opposite:  L'Oréal supported Johnson through this and sent her information on caring for her sister.   Pl. Counter 56.1 Stmt. ¶ 134.

* * *

The Court therefore grants summary judgment in favor of L'Oréal on Johnson's disability discrimination claims under federal and state law.

## C.  Johnson's Retaliation Claim under Title VII, Section 1981, and New York State Law[8]

Finally, Johnson claims L'Oréal retaliated against her for texting Bethelmy-Rada on June 6, 2018 about Krafft's "sexist" and "intolerant" behaviors.[9]   Title VII "makes it unlawful for an employer to discriminate against an employee for opposing any practice made unlawful by Title VII." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 567 (2d Cir. 2011); *see* 42 U.S.C. § 2000e–3(a).   "Although the statute is silent on the issue, workplace retaliation is actionable under § 1981." *Amaya v. Ballyshear LLC*, 295 F. Supp. 3d 204, 226 (E.D.N.Y. 2018) (citing *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 451 (2008)).   Under New York law, it is illegal to "retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article."   N.Y. Exec. Law § 296.

Claims under Title VII, section 1981, and New York State law are generally treated as

---

[8]  The scope of Johnson's retaliation claims is not particularly clear.   The Amended Complaint brings claims for retaliation under Title VII, Am. Compl. ¶¶ 270-273, section 1981, *id.* ¶¶ 278-281, the ADA, *id.* ¶¶ 302-305, and State and City law, *id.* ¶¶ 289-296.   Johnson appears to have abandoned her claim that L'Oréal retaliated against her for requesting a reasonable accommodation.   But even if she had not, any such claim would fail, as there is nothing in the record to support such a claim.

[9]  Johnson states that she "[e]ngaged in [p]rotected [a]ctivity on at least [t]wo [o]ccasions," Opposition at 18, but it is not clear what, beyond her June 6, 2018 text message, she contends was a protected activity.

analytically identical, and are subject to the *McDonnell Douglas* framework articulated above. *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 n.7, 112 (2d Cir. 2019). A *prima facie* case of unlawful retaliation requires that a plaintiff must "show '(1) that [she] participated in a protected activity, (2) that [she] suffered an adverse employment action, and (3) that there was a causal connection between [her] engaging in the protected activity and the adverse employment action.'" *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 391 (2d Cir. 2020) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010)).

Even assuming Johnson's text message was a protected activity, the record does not support a reasonable inference that L'Oréal fired her because of this message. Again, L'Oréal has provided a neutral reason for terminating Johnson, and in order to show that this reason is pretext, Johnson must show that the protected action was the but-for cause of the adverse employment action. *Rasmy*, 952 F.3d at 391; *accord Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015).

The record reflects that, even after Johnson sent the June 6, 2018 text, L'Oréal had not decided to fire Johnson. Indeed, Bethelmy-Rada responded that he wished to speak with her when she returned so that he could understand more about the issue. Def. 56.1 Stmt. ¶¶ 199, 203. Then, on June 11, 2018, Bethelmy-Rada emailed Morales saying he wanted to "see how [Johnson] comes back from holidays," and that he wanted to "brainstorm solutions with [Morales] and propose something to [Johnson] until she feels good/better." Pl. Counter 56.1 Stmt. ¶ 207. Morales responded that she was going to schedule a time to meet with Johnson to "regroup" and share certain issues she had heard about her. Morales Declaration, Exh. H.

Then, on June 15, 2018, Diorio shared Johnson's tweets and text messages with Bethelmy-Rada. Def. 56.1 Stmt. ¶¶ 227-229. It was only after this that Bethelmy-Rada told Morales that

Johnson could not stay on his team, *id.* ¶¶ 242-244, and Bethelmy-Rada, Morales, and Feege, L'Oréal's in-house counsel, decided that Johnson had to be let go, *id.* ¶ 249.  The Court must, of course, be cautious in assessing what motivated L'Oréal to terminate Johnson; questions of intent are typically a question for the jury.  *See Rasmy*, 952 F.3d at 392 & n.61.  But here the record simply does not support any inference that L'Oréal fired Johnson because of her text message about Krafft.

Because the Court concludes that there is no reasonable inference that L'Oréal retaliated against Johnson for her June 6, 2018 text message regarding Krafft's "sexist" and "intolerant" behavior, the Court grants summary judgment on her retaliation claims as well.

## D.  Johnson's Claims Under the NYCHRL

The NYCHRL imposes a lower standard for discrimination claims.  The NYCHRL must be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc*., 715 F.3d 102, 109 (2d Cir. 2013).  "Thus, even if the challenged conduct is not actionable under federal and state law, federal courts must consider separately whether it is actionable under the broader New York City standards." *Id.*  While the first two elements of a NYCHRL are similar to those of a Title VII, the other two elements differ:  For "the third prong of a *prima facie* case of discrimination under the NYCHRL, a plaintiff must simply show that she was treated differently from others in a way that was more than trivial, insubstantial, or petty." *Kellman v. Metro. Transp. Auth.*, 8 F. Supp. 3d 351, 379 (S.D.N.Y. 2014).  The employment action need not be "materially adverse." *Gorman v. Covidien, LLC*, 146 F. Supp. 3d 509, 530 (S.D.N.Y. 2015).  As to the fourth prong, a plaintiff need only be treated differently than a worker not belonging to the plaintiff's protected class. *Maynard*, 2021 WL 396700, at *5.  In other words, the plaintiff "need only show differential treatment—that

she [wa]s treated 'less well'—because of a discriminatory intent." *Mihalik*, 715 F.3d at 110. An employer is only entitled to summary judgment "if the record establishes as a matter of law that discrimination play[ed] no role in its actions." *Id.* at 110 n.8 (internal quotation marks and citation omitted).

Courts in this District regularly decline to exercise supplemental jurisdiction over plaintiffs' NYCHRL claims after dismissing or granting summary judgment on all federal claims. "Indeed, judges in this district have declined to exercise supplemental jurisdiction over state-law claims even when the federal claims were dismissed on summary judgment." *Harris v. NYU Langone Med. Ctr.*, No. 12 Civ. 454 (RA), 2014 WL 941821, at *2 (S.D.N.Y. Mar. 11, 2014) (collecting cases), *aff'd*, 615 F. App'x 49 (2d Cir. 2015); *see also* 28 U.S.C. § 1367(c) (explaining that a district court "may decline to exercise supplemental jurisdiction over a claim" once it "has dismissed all claims over which it has original jurisdiction"). "[C]omity counsels against exercising jurisdiction over [a plaintiff's] NYCHRL claim[s], as the NYCHRL 'has a lower threshold of proof than its federal counterparts' and 'has been applied primarily at the intermediate appellate level of the state courts, with limited opportunity for the New York Court of Appeals to construe it.'" *Harris*, 2014 WL 941821, at *2 (quoting *Thomas v. City of New York*, 953 F. Supp. 2d 444, 462 (E.D.N.Y. 2013)). While the Court grants summary judgment on the claims over which it has original jurisdiction, as well as the state law claims governed under the same standards, it declines to exercise supplemental jurisdiction over Johnson's NYCHRL claims and dismisses those claims without prejudice to filing in state court.

## IV. Conclusion

For the reasons stated above, the Court grants L'Oréal's motion for summary judgment on all claims, except that it declines to exercise supplemental jurisdiction over claims under the

NYCHRL and therefore dismisses those claims without prejudice.   The Clerk of the Court is respectfully directed to terminate the motion pending at Docket Number 97 and close this case.

SO ORDERED.

Dated: September 30, 2021
       New York, New York

JOHN P. CRONAN
United States District Judge