**MANDATE**

21-2914-cv
Johnson v. L'Oréal USA

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

# SUMMARY ORDER

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 27th day of March, two thousand twenty-three.

PRESENT:
        EUNICE C. LEE,
        ALISON J. NATHAN,
            *Circuit Judges.*
        JED S. RAKOFF,
            *District Judge.*[*]

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Apr 17 2023

Amanda Johnson,

    *Plaintiff-Appellant*,

v.                                                     21-2914-cv

L'Oréal USA,

    *Defendant-Appellee*.

FOR PLAINTIFF-APPELLANT:          GREGORY S. CHIARELLO, (Allison Van Kampen, *on the brief*), Outten & Golden LLP, New York, NY.

---

[*] Judge Jed S. Rakoff, of the United States District Court for the Southern District of New York, sitting by designation.

| | |
|---|---|
| FOR DEFENDANT-APPELLEE: | JEAN L. SCHMIDT, Littler Mendelson P.C., New York, NY. |

Appeal from a judgment of the United States District Court for the Southern District of New York (Cronan, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

Plaintiff-Appellant Amanda Johnson appeals from the district court's grant of summary judgment for Defendant-Appellee L'Oréal USA (L'Oréal), her former employer, and from the court's denial of her subsequent motion to amend or alter the judgment. This appeal concerns Johnson's claims of discrimination and retaliation in violation of federal and state law arising out of L'Oréal's decision to terminate her employment in June 2018. We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

## BACKGROUND

Johnson, a Black woman, was hired by L'Oréal as an assistant vice president in 2016. She suffers from depression and anxiety. In her role at the company, she reported to Daniel Bethelmy-Rada, then a L'Oréal global brand president. At first, Johnson was successful in her role at L'Oréal, and it is undisputed that Bethelmy-Rada initially supported her career. However, Bethelmy-Rada's estimation of her work began to change in late 2017, as Johnson developed a pattern of being absent from work. Around December 2017, Bethelmy-Rada observed a decline in Johnson's performance and friction between Johnson and her peers and direct reports. Indeed, on at least two occasions in late 2017 and early 2018, L'Oréal employees reported to Human

2

Resources (HR) that Johnson had acted inappropriately in arguments with other L'Oréal executives. Johnson attributes these issues to her worsening depression and anxiety.

On February 28, 2018, Maria Morales, an assistant vice president of HR, met with Johnson and discussed various issues, including the complaints about Johnson's behavior toward other employees. Morales told Johnson she wanted to meet again in a few weeks and scheduled a meeting for March 20, 2018. This follow-up meeting never occurred, however, as Johnson traveled to Jamaica between March 19th and 26th on medical leave taken at the recommendation of her therapist.

On April 2, 2018, Jeanna Diorio, one of Johnson's direct reports, met with Farida Mercedes, an HR employee, to raise various complaints about Johnson, including with her performance and unannounced absences. Among other issues, Diorio showed Mercedes text messages Johnson had sent her, which included an exchange from March 2017 in which Johnson had told Diorio that she was "about to crawl so deep and so far into" another L'Oréal employee's "a[**] that he will think I live in his f[***]ing small intestines" and that she would "f[***]ing destroy" him. J. App'x at 1868–69 ¶¶ 233–34.

Two days later, on April 4th, Bethelmy-Rada and Morales met with Johnson and raised several issues, including her frequent absences, lack of engagement, problematic behavior directed toward other colleagues, and friction within her team. Morales also told Johnson that someone had come forward with complaints about Johnson, including about certain text messages she had sent regarding "intestines." Bethelmy-Rada and Morales asked Johnson whether they could do anything to help her and if she needed to take time off. They also offered to connect her with other resources such as a therapist. Johnson declined these offers of assistance. A couple of days

3

later, on April 6th, Johnson texted Morales that she was "putting together an action plan with [her] doctor," which Johnson said she would share with Morales and Bethelmy-Rada "early next week." J. App'x at 1835 ¶ 130. Morales told Johnson, "I'm here when you are ready. I want you to feel better, that's the most important thing." J. App'x at 1836–37 ¶ 136. However, Johnson never shared a plan with Morales, nor did she ever respond to Morales and Bethelmy-Rada's offers of assistance or seek any accommodation between April 7th and June 19th, when she was fired.

Meanwhile, HR launched an investigation into Diorio's allegations and conducted interviews with each of Johnson's direct reports. Johnson's team members all reported concerns with Johnson's frequent absences, performance, and behavior. These concerns were also reflected in internal performance metrics. Whereas Johnson had scored a 4.3/5.0 in May 2017 on L'Oréal's biannual leadership behavior survey, in April 2018, she had fallen to a 3.2, below the 4.2 average score for managers in her division.

On May 26, 2018, Johnson arrived in Paris for an annual L'Oréal conference. That day, on her Twitter account, Johnson tweeted, "Me and 2 other coworkers just landed and arrived at hotel at 3:15p local time. My boss: let's meet at 3:30! Me currently:" followed by a picture of her hand holding a glass of wine. J. App'x at 212, 1848 ¶ 173. This was followed by other tweets stating, in part, "I'm not jumping head first into work right now. I just got off the f[***]ing plane . . . . Also I am a GLOBAL VP and my POS company insists on international economy. . . ." J. App'x at 213. Two days later, on May 28th, Johnson and Nicholas Krafft, a peer, got into an argument while they were waiting to depart for a meeting. Johnson went on vacation following the conclusion of the global conference and was scheduled to return in mid-June 2018.

On June 6, 2018, while still on vacation, Johnson texted Bethelmy-Rada, "I would be

4

remiss not to formally report intolerant—and frankly outright inappropriate—behaviors that I witnessed on this trip," namely from Krafft, who was "rude," "short and dismissive," and is "sexist" and "intolerant." J. App'x at 1856–57 ¶ 200. Bethelmy-Rada replied that they should discuss her concerns in person when she returned from vacation. Bethelmy-Rada then texted another employee who was present for the altercation between Johnson and Krafft about what happened and asked for "an objective perspective"; the employee responded that it was "just a bit of tension flaring" and did not strike him as "anything excessive." J. App'x at 1855 ¶¶ 196–97.

On June 11, 2018, Bethelmy-Rada emailed Morales that "during [the L'Oréal conference] there were a couple of incidents that got me worried about [Johnson's] emotional state," and that "[f]or her own good and the team's I would like to prevent this from happening again and would like to brainstorm solutions with you and propose something to her until she feels good / better," but expressing optimism that "[s]he's been off since [the conference] so hopefully she'll be back in great shape." J. App'x at 1859 ¶ 207. Morales replied the next day that she was "very concerned about that situation"; that she feared that "this is turning into a performance issue"; that "[r]egardless of the rationale, [Johnson] is isolating her team, her colleagues and her cross functional partners"; and that Morales planned to schedule time with Johnson to "regroup with her" and "share with her what I have been hearing thematically." J. App'x at 1860 ¶ 210.

On June 13, 2018, Diorio met again with Mercedes to share tweets from Johnson that she found alarming and unprofessional, including the ones posted on May 26th. Two days later, on June 15th, Diorio met with Bethelmy-Rada to inform him she had lodged an ethics complaint against Johnson. At the meeting, Diorio recounted her concerns with Johnson's leadership, behavior, and absences, and provided Bethelmy-Rada with copies of the text messages and social

5

media posts she had previously raised with HR. Bethelmy-Rada then met with Morales, stating that Johnson's behavior was intolerable, that the text messages were unacceptable, and that he could no longer have Johnson on his team. Bethelmy-Rada and Morales then met with Morales's supervisor and in-house counsel, and, after requesting and receiving screenshots of the full text-message threads from Diorio, together made the decision to terminate Johnson.

On June 17, 2018, Morales circulated an email to Bethelmy-Rada and her supervisor to discuss scheduling a meeting with Johnson for the following day to terminate her, listing as topics for discussion and bases for termination (1) "[i]nappropriate behavior toward peers, cross functional partners and toward senior management" including "yelling, speaking in an aggressive manner and making the other person feel physically intimidated," including as examples, among others, the "conflict" with Chizuru Wykoff, a peer, and Bethelmy-Rada, and a text message "badmouthing" a country leader to other employees; (2) lack of leadership, including her lack of physical presence in the office, inappropriate text messages, and her team's perception that she makes decisions based on her mood; and (3) social media posts on a public account that do not embody leadership qualities, including the picture of the wine glass when she was supposed to be at work, calling L'Oréal a "POS" company, and "[r]ace comments." J. App'x at 728. On June 19, 2018, Morales and her supervisor met with Johnson and terminated her, citing Johnson's inappropriate communications, tension within the team, and absences.

Johnson filed suit in October 2018. She asserts claims of race and disability discrimination and unlawful retaliation under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 1981, the Americans with Disabilities Act (ADA), the New York State Human Rights Law (NYSHRL), and the New York City Human Rights Law (NYCHRL). Following discovery,

6

the district court granted summary judgment to L'Oréal on all of Johnson's claims except those under the NYCHRL, over which the court declined to exercise supplemental jurisdiction. *See Johnson v. L'Oréal USA*, No. 18-CV-9786 (JPC), 2021 WL 4482167 (S.D.N.Y. Sept. 30, 2021). The district court subsequently denied Johnson's motion to amend or alter the judgment under Rule 59(e) of the Federal Rules of Civil Procedure. This appeal followed.

## DISCUSSION

We review the district court's grant of summary judgment *de novo*. *See Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 386 (2d Cir. 2020).[1] "In evaluating such motions, the district court must resolve any doubts and ambiguities and draw all reasonable inferences in favor of the nonmoving party." *Id.*

**I.      Race Discrimination**

Johnson argues that she was terminated unlawfully because of her race. The district court assumed that Johnson established a prima facie case of race discrimination. Nevertheless, the court granted L'Oréal's summary judgment motion, concluding that the company had legitimate non-discriminatory bases for Johnson's termination and that Johnson had failed to meet her burden to show that these reasons were pretextual. We agree.

"Title VII makes it unlawful for an employer 'to . . . discharge any individual, or otherwise to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (quoting 42

---

[1] Unless otherwise indicated, all internal citations, quotation marks, and alterations are omitted.

7

U.S.C. § 2000e-2(a)(1)).  Section 1981 of the Civil Rights Act of 1866 and the NYSHRL contain similar protections, *see* 42 U.S.C. § 1981(a); N.Y. Exec. Law § 296(1)(a), and we typically analyze discrimination claims under all three statutes under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).  *See Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012).[2]

Under this framework, if a plaintiff establishes a prima facie case of racial discrimination, "the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for its action."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008).  If the defendant meets that burden, the "plaintiff must put forth adequate evidence to support a rational finding that the legitimate non-discriminatory reasons proffered by the employer were false, and that more likely than not the employee's . . . race was the real reason for the discharge."  *Holt v. KMI-Cont'l, Inc.*, 95 F.3d 123, 129, 132 (2d Cir. 1996).  "The plaintiff has the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against her on account of her . . . race."  *Id.*

Here, the record provides ample support for L'Oréal's asserted non-discriminatory reasons for Johnson's termination—namely, serious performance issues, including serial absences; a dramatic drop in her internal leadership metrics; ongoing conflicts within and across teams;

---

[2] Johnson argues on appeal that, following amendments to the NYSHRL enacted in 2019, her NYSHRL claims should instead be evaluated under the more liberal standards applicable to claims under the NYCHRL.  But Johnson never raised this argument in the district court and fails to respond to L'Oréal's contention that the amendments to the NYSHRL do not have retroactive effect and therefore do not apply to her claims.  Because this argument was raised for the first time on appeal, we decline to consider it and, like the district court, analyze Johnson's NYSHRL claims along with her federal law claims.  *See Otal Invs. Ltd. v. M/V CLARY*, 673 F.3d 108, 120 (2d Cir. 2012) ("[T]he well-established general rule [is] that a court of appeals will not consider an issue raised for the first time on appeal."); *see also Carlisle Ventures, Inc. v. Banco Espanol de Credito, S.A.*, 176 F.3d 601, 609 (2d Cir. 1999) (declining to consider an appellant's argument in part where the appellant "d[id] not respond to [the appellee's] . . . argument in its [r]eply [b]rief").

8

inappropriate communications with peers and subordinates, both verbally and via text message; and improper social media posts.

Johnson argues that L'Oréal's stated reasons for her termination are pretextual by pointing to direct evidence of race discrimination and arguing that she was treated differently from other similarly situated employees. These arguments, however, are unavailing.

As direct evidence of discrimination, Johnson points to remarks allegedly made by Wykoff in 2017 regarding Johnson's hair, and by Krafft in 2019, allegedly made after her termination, regarding "dark" customers. "In determining whether a remark is probative" of discrimination, courts consider "four factors: (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)." *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010). Applying this framework, we conclude that, although a reasonable juror could no doubt view Wykoff and Krafft's remarks as discriminatory, they do not give rise to an inference of discrimination *in the decision to fire Johnson*, as they were neither made by a decision-maker, nor connected with or temporally close to the June 2018 decision to fire her.

Beyond these remarks, Johnson also argues that pretext can be inferred based on differential treatment of other similarly situated L'Oréal employees. "A showing that similarly situated employees belonging to a different racial group received more favorable treatment can . . . serve as evidence that the employer's proffered legitimate, non-discriminatory reason for the adverse job action was a pretext for racial discrimination." *Graham v. Long Island R.R.*, 230 F.3d

9

34, 43 (2d Cir. 2000). "An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." *Ruiz v. County of Rockland*, 609 F.3d 486, 493–94 (2d Cir. 2010). "The standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." *Id.* at 494.

The comparators Johnson points to were not "similarly situated to [her] in all material respects." *Id.* She claims that Bethelmy-Rada, her boss, and Nour Tayara, her peer, were permitted to maintain harsh and abrasive management styles without suffering consequences. In addition, she claims that a March 14, 2019 HR complaint was made against Krafft, her peer, for allegedly making openly racist comments about dark-skinned customers, which conduct was never reprimanded. No jury could reasonably conclude, based on this record, that these individuals engaged in comparable conduct. There is no evidence, for example, that these individuals sent or posted anything approximating the text and social media messages that Johnson did. And while there is evidence that Bethelmy-Rada, at least, missed meetings on several occasions, this conduct is still too dissimilar from Johnson's serial absences over a period of months to support an inference of pretext. While Johnson does also argue that Bethelmy-Rada engaged in more serious misconduct, the district court correctly declined to consider these allegations as part of the comparator analysis either because they were supported solely by inadmissible hearsay evidence, *see Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169–70 (2d Cir. 2014), or because the conduct was never reported to L'Oréal, *see Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 82 (2d Cir. 2005) ("[D]iscriminatory intent cannot be inferred, even at the *prima facie* stage, from circumstances unknown to the defendant."); *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64–65 (2d Cir.

10

1997) ("It is impossible to demonstrate that UPS treated similarly situated males differently when there is no evidence that UPS knew about" their similar alleged violations.). Krafft, who was the subject of a March 2019 complaint regarding remarks about "dark" customers, could not reasonably be deemed on this record to have made remarks approximating the inappropriate text messages and social media posts from Johnson, nor could a jury conclude that he had similar performance issues, such as persistent absenteeism. Johnson also points to racially inflammatory social media posts by L'Oréal spokespeople who were nevertheless retained or rehired, but there is no basis in the record to infer that these individuals were "subject to the same performance evaluation and discipline standards," *Ruiz*, 609 F.3d at 493–94, as a senior executive like Johnson.

Further, Johnson argues that pretext can be inferred because L'Oréal's account of the decision to terminate Johnson is not credible. Specifically, Johnson argues that, because Bethelmy-Rada had known about the text messages sent by Johnson months before her termination, a fact-finder could discount his testimony that he only decided that Johnson could no longer be on his team after Diorio physically showed him Johnson's problematic text messages and social media posts on June 15, 2018. But the record reflects only that Diorio told HR about the text messages on April 2, 2018, and that they were discussed at the meeting between Johnson, Morales, and Bethelmy-Rada two days later. There is no evidence to contradict Bethelmy-Rada's testimony that the first time he actually saw the text messages in their entirety was when Diorio provided them to him on June 15, 2018, Morales's testimony that she never showed Bethelmy-Rada the text messages, or Diorio's testimony that Bethelmy-Rada said he had never previously seen the text messages when she showed them to him. *See, e.g.*, *Weinstock v. Columbia Univ.*, 224 F.3d 33, 44 (2d Cir. 2000) (holding plaintiff failed to adduce "evidence sufficient to create a

11

genuine issue of fact as to her contention" that potentially discriminatory language was used at committee meeting in face of testimony from committee members that no one had used such language to refer to plaintiff). Nor does Johnson provide evidence disputing that that same meeting was the first time he had seen Johnson's social media posts.

In sum, we affirm the district court's conclusion that summary judgment on Johnson's race discrimination claims is warranted because no reasonable jury could find on this evidentiary record that L'Oréal's non-discriminatory reasons for firing Johnson were pretextual.[3]

## II. Disability Discrimination

Johnson also alleges that she was fired because of her disability—anxiety and depression—in violation of the ADA and NYSHRL. ADA employment discrimination claims are also evaluated under the *McDonnell Douglas* framework. *See Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006). "To establish a prima facie case under the ADA, a plaintiff must show by a preponderance of the evidence that: (1) h[er] employer is subject to the ADA; (2) [s]he was disabled within the meaning of the ADA; (3) [s]he was otherwise qualified to perform the essential functions of h[er] job, with or without reasonable accommodation; and (4) [s]he suffered adverse employment action because of h[er] disability." *Id.*; *see also Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (same for disability discrimination claim under NYSHRL). The district court assumed that Johnson had made out a prima facie case of disability discrimination but held

---

[3] Johnson very briefly argues that the district court should have also evaluated her claims under a mixed-motive analysis. Although direct evidence of discrimination is not required in mixed-motive cases, we nevertheless conclude that this record is insufficient to permit a rational finder of fact to conclude that Johnson's race "was a motivating factor" in the decision to terminate her. *Holcomb*, 521 F.3d at 141–42 & n.3; *see Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 162 (2d Cir. 1998) (explaining that "stray remarks in the workplace by persons who are not involved in the pertinent decisionmaking process" are insufficient to invoke a mixed-motive framework).

12

that Johnson failed to show that L'Oréal's non-discriminatory reasons for firing her were pretextual. Once again, we agree.

Johnson argues that there is evidence of disability-based animus in the record but does so by pointing largely to complaints about her performance and frequent absences. "[U]nder the ADA," however, "workplace misconduct"—a category which includes credible complaints about one's work performance—"is a legitimate and nondiscriminatory reason for terminating employment, even when such misconduct is related to a disability." *McElwee v. County of Orange*, 700 F.3d 635, 641 (2d Cir. 2012); *see id.* at n.4 ("The ADA does not excuse workplace misconduct because the misconduct is related to a disability."); *see also, e.g.*, *Hazen v. Hill Betts & Nash, LLP*, 936 N.Y.S.2d 164, 170 (App. Div. 1st Dep't 2012) ("Well-established precedent demonstrates that the [NYSHRL] does not immunize disabled employees from discipline or discharge for incidents of misconduct in the workplace."). Johnson's remaining arguments would not allow a jury to conclude that L'Oréal's non-discriminatory reasons for her termination were pretextual for substantially the same reasons as her race discrimination claims fall short.

To the extent Johnson presses an independent claim that L'Oréal failed to provide her a reasonable accommodation for her disability by failing to engage in a meaningful interactive process with her, we reject that argument as well.[4] In a failure to accommodate claim, "the

---

[4] From the face of the appellant's brief, it is unclear whether Johnson did in fact bring a separate "reasonable accommodation" claim. In the table of contents of her submission, Johnson alleges L'Oréal's "fail[ure] to provide reasonable accommodation" as part of Point IV of her brief, in which she argues that the dismissal of Johnson's *disability discrimination* claims was error. Indeed, she views "L'Oréal's [alleged] failure to provide meaningful accommodation for Johnson's known disability" as "further evidence of *discrimination*," citing a case in which this Court stated that an "[e]mployer's failure to engage in a good faith interactive process can be introduced as *evidence tending to show disability discrimination*." Appellant's Br. at 55–56 (emphasis added) (quoting *Sheng v. M&T Bank Corp.*, 848 F.3d 78, 87 (2d Cir. 2017)). Nevertheless, as explained above, Johnson's reasonable accommodation claim is meritless, even if we assume it was properly pressed.

13

plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow [her] to perform the essential functions of [her] employment." *McMillan v. City of New York*, 711 F.3d 120, 126 (2d Cir. 2013). "Although it is generally the responsibility of the individual with a disability to inform the employer that an accommodation is needed . . ., under certain circumstances, an employer is required to act proactively and engage in an interactive process to accommodate the disability of an employee even if the employee does not request accommodation." *McElwee*, 700 F.3d at 641–42.

Johnson's claim fails because she has not demonstrated the existence of a reasonable accommodation that would have allowed her to perform the essential functions of her employment. Even where the employer is required to engage in an interactive process, "an employee may not recover based on h[er] employer's failure to engage in an interactive process if [s]he cannot show that a reasonable accommodation existed at the time of h[er] dismissal." *Id.* at 642. No such accommodation is apparent from Johnson's briefing either on appeal or at the district court. When pressed at oral argument, Johnson's counsel identified "meaningful time off" as the accommodation Johnson would seek. Oral Arg. at 1:20. But Johnson failed to proffer evidence in the record from which a fact-finder could conclude that such an accommodation was available and would have allowed Johnson to perform the essential functions of her job, an omission which is fatal to her accommodation claim. *See, e.g.*, *Stevens v. Rite Aid Corp.*, 851 F.3d 224, 231 (2d Cir. 2017) ("Because Stevens failed to present any evidence suggesting the existence of a reasonable accommodation at the time of his termination, he cannot recover based on Rite Aid's failure to engage in an interactive process, even if such a failure occurred.").

In any event, the record reflects that L'Oréal did engage in an interactive process with

14

Johnson, including the February 28, 2018 meeting with Morales and the April 4, 2018 meeting with Bethelmy-Rada and Morales, at which Bethelmy-Rada and/or Morales raised concerns with Johnson's performance and well-being, asked questions about what they could do to support Johnson, and offered time off.  Johnson did not accept these offers nor request any other form of assistance.  In short, we agree with the district court's conclusion that "the record reflects that L'Oréal reached out to provide several resources to Johnson and asked her what she needed," and "[t]hat Johnson failed to take advantage of those resources or ask for an additional accommodation does not mean that L'Oréal denied her a reasonable accommodation."  *Johnson*, 2021 WL 4482167, at *17.

   **III.   Retaliation**

Johnson also brings a retaliation claim under federal and state law arguing that her termination constituted retaliation for her June 6, 2018 protected activity, namely her complaint to Bethelmy-Rada that Krafft had been "sexist" and "intolerant" at the annual L'Oréal conference in France.  As with Johnson's first two claims, the same *McDonnell Douglas* burden-shifting framework applies.  *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015).  A plaintiff must first demonstrate a prima facie case that she suffered an adverse employment action as a result of her protected activity, and then the defendant may rebut that showing with a legitimate, non-retaliatory reason for the adverse employment action, in which case "the presumption of retaliation dissipates, . . . and the plaintiff must prove that the desire to retaliate was the but-for cause of the challenged employment action."  *Id*.  Here again, the record would not allow a reasonable fact-finder to infer that Johnson's June 6, 2018 email complaining about Krafft's actions in Paris was the but-for cause of her termination.

15

Although there is a close temporal proximity between Johnson's complaint on June 6, 2018, and her termination on June 19, 2018, "[t]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013). Indeed, the undisputed record instead reflects that in the days following the June 6th email, L'Oréal was still not planning to fire Johnson. Bethelmy-Rada responded to Johnson that he wanted to discuss the altercation with Krafft further in person after she returned from vacation and contacted another employee who was present for the incident between Johnson and Krafft for an "objective perspective." J. App'x at 1855–56 ¶¶ 196–97, 1857–58 ¶ 203. On June 11, 2018, Bethelmy-Rada emailed Morales regarding his concerns about Johnson, but in terms that clearly contemplated her continued employment. It was only after Diorio met with Bethelmy-Rada on June 15, 2018, and showed him Johnson's problematic text messages and tweets in their entirety, that Bethelmy-Rada told Morales that he could no longer have Johnson on his team. On this record, we agree with the district court that no fact-finder could reasonably determine that Johnson's complaint about Krafft was a but-for cause of her termination.

## IV.    Rule 59(e) Motion

Finally, Johnson appeals from the district court's denial of her motion under Rule 59(e) of the Federal Rules of Civil Procedure seeking to clarify the court's order on summary judgment. "A district court's denial of a party's motion to alter or amend judgment under Rule 59(e) is . . . reviewed for an abuse of discretion." *Munafo v. Metro. Transp. Auth.*, 381 F.3d 99, 105 (2d Cir. 2004). We find no abuse of discretion in the district court's denial of Johnson's Rule 59(e) motion. The district court's summary judgment ruling made clear that its evaluation of the record was based on federal law standards and that it was not deciding Johnson's claims under the more

16

liberal standards of the NYCHRL.

\*\*\*

We have considered Johnson's remaining arguments and find them to be without merit.

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

17